# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DCI SOLUTIONS INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>URBAN OUTFITTERS, INC., a Pennsylvania corporation, and Does 1-20,<br><br>Defendants.<br><br>AND RELATED COUNTER CLAIM. | CASE NO. 10cv0369 - IEG (BGS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**<br><br>[Doc. No. 47] |

In this contract dispute, Plaintiff DCI Solutions, Inc. ("DCI") asserts four claims against Defendant Urban Outfitters, Inc. ("Urban"): (1) fraud in the inducement, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) quantum meruit. Presently before the Court is a motion for summary judgment or, in the alternative, partial summary judgment brought by Urban. Having considered the parties' arguments, and for the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** Urban's motion.

///

///

///

# BACKGROUND

## I. The Parties

Plaintiff DCI Solutions, Inc. ("DCI") is a company specializing in overhead cost reduction services. Working on a contingency basis, DCI helps companies identify areas where savings are possible. DCI does not charge any up-front fees and begins billing its clients only after the client has begun saving money. Among the services DCI performs for its clients is a "benchmarking" analysis. Benchmarking is the process whereby DCI compares the rates paid by one client for a particular service with the rates other companies pay for the same service. Either DCI or the client can then use the benchmarks to negotiate lower rates with new carriers or renegotiate its rates with its existing carriers.

Defendant Urban is a specialty retail company which offers a variety of "lifestyle" merchandise to highly defined customer niches through "Urban Outfitters," "Anthropologie" and "Free People" retail stores in the United States, Canada, and Europe, as well as through websites, catalogues and wholesale concepts.

## II. The Contract

In 2007, DCI approached Urban about the prospect of providing consulting services to Urban. All negotiations between DCI and Urban were conducted by the same two individuals: Kirk Conole on behalf of DCI and John Kyees on behalf of Urban.

In October 2007, DCI and Urban entered into a written, integrated contract. By the terms of the two-page agreement, DCI promised to recommend ways in which Urban could reduce its "Less than Truckload" ("LTL") and Truckload freight costs. In exchange, Urban agreed to pay DCI a portion of the "Savings" it obtained. "Savings" are defined as any cost reductions that "result from any DCI recommendation during the thirty-six months which follow the completion of the recommendation's implementation." The contract provides that "DCI shall not be compensated for any recommendation which Client declines and does not use. Compensation is due if Client receives Savings in area cost where DCI previously disclosed a Savings recommendation."

///

### III. Performance under the Contract

In November 2007, DCI's independent contractor, Robert Fike, spent about 90 minutes at Urban's main distribution center gathering sample invoices and speaking with Urban's transportation logistics managers. Thereafter, Fike and DCI's principal, Jim Baker, spent an additional 30 hours performing DCI's benchmarking analysis.

DCI's recommendations for cost savings were contained in a document entitled Disclosure of Savings to Urban Outfitters, dated November 16, 2007. The Disclosure of Savings referred to an attached spreadsheet, which listed the rates Urban paid for LTL freight shipments to three freight carriers (New Penn, Roadway, and Gilbert), and the "DCI rate" that DCI believed could potentially be obtained with these same carriers. DCI concluded that Urban could "potentially reduce" overall LTL freight costs with the three carriers by "20% to 30%." DCI's recommendation further stated that the "Savings" could be obtained by Urban Outfitters' staff or by DCI. The Disclosure of Savings also included a Letter of Authorization ("Letter") for John Kyees to sign. The Letter would have empowered DCI to negotiate better rates on Urban's behalf. Notwithstanding DCI's attempts, Kyees never signed the Letter.

From DCI's perspective, Urban became less and less cooperative over time. Principally, Urban's managers failed to provide DCI with the amount of Urban's "spend" (i.e. the amount spent on shipping). Eventually, DCI obtained some, but not all copies of Urban's pricing agreements with its carriers. To DCI's dismay, an Urban manager assigned to oversee the project temporarily, Matt Kaness, denied the existence of a signed agreement between the parties.

On July 3, 2008, Urban's Kenneth McKinney sent Jim Baker an email stating, "I had discussion with John Kyees, and my recommendation to him was that we not engage in a partnership with DCI at this time." Over the next several weeks, DCI attempted to get Urban to perform under the contract. In July 2008, Baker sent Kyees a letter expressing a number of concerns related to Urban's performance under the parties' agreement. Urban broke off all communications with DCI by the end of August 2008.

///

///

### IV. Urban's Interactions with Carriers

Terese Tubbs has been Urban's Manager of Transportation Logistics since 2003. Tubbs' responsibilities include negotiating with Urban's freight carriers to obtain "good rates." Tubbs testified that believes she has obtained the "best rates possible." Tubbs also acknowledged it would reflect "poorly" on her if DCI was able to find better available rates. At her deposition, Tubbs was unable to identify any instances in which she asked a carrier for a rate reduction. The following is a summary of evidence DCI has submitted regarding interactions between Tubbs and Urban's carriers before and after DCI issued its recommendations in November 2007.

*a.  New Penn*

William Sawdey of New Penn has been the account representative for the Urban account for over 18 years. In December 2006, Urban entered into a two-year price agreement with New Penn that increased Urban's base rate by 3% in the first year and by 2% in the second year. Terese Tubbs did not ask for a rate reduction in connection with the December 2006 pricing agreement. Nor, according to both Tubbs and Sawdey, had Tubbs ever asked for a rate reduction prior to the December 2006 pricing agreement. In its November 2007 Disclosure of Savings, DCI estimated that Urban would be able to save at least 20% on its rates with New Penn. In December 2008, Urban negotiated a 27% rate reduction with New Penn.

*b.  Gilbert*

Prior to November 2007, Tubbs had never asked Gilbert for reduction in general rates. In its November 2007 Disclosure of Savings, DCI estimated that Urban would be able to save at least 3% on its rates with Gilbert. In December 2008, Tubbs approached Gilbert and obtained a 3% rate reduction.

*c.  Roadway*

In its November 2007 Disclosure of Savings, DCI estimated that Urban would be able to save at least 30% on its rates with Roadway. In July 2008, Terese Tubbs called Roadway's attention to the above market rates, and Roadway's account manager confirmed that if approached by DCI, Roadway "will not do the lower rates." Yet in April 2009, Urban obtained a 17.5% rate reduction from Roadway.

**V.    Procedural Background**

In January 2010, DCI filed this action in the Superior Court for the County of San Diego. Urban removed the action to this Court based on diversity jurisdiction. In its complaint, DCI has asserted four claims: (1) fraud in the inducement, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) quantum meruit. In response to DCI's complaint, Urban filed an answer and several counterclaims. In May 2010, the Court dismissed all but one of Urban's counterclaims. Urban filed an amended answer and amended counterclaims, and DCI filed an answer. Urban filed the present motion on January 21, 2011. DCI filed an opposition, and Urban filed a reply along with objections to evidence. The Court heard oral argument on February 28, 2011.

## DISCUSSION

**I.    Legal Standard for a Motion for Summary Judgment**

Summary judgment is proper where the pleadings and materials demonstrate "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A material issue of fact is a question a trier of fact must answer to determine the rights of the parties under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears "the initial responsibility of informing the district court of the basis for its motion." Celotex, 477 U.S. at 323. To satisfy this burden, the movant must demonstrate that no genuine issue of material fact exists for trial. Id. at 322. Where the moving party does not have the ultimate burden of persuasion at trial, it may carry its initial burden of production in one of two ways: "The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., v. Fritz Cos., 210 F.3d 1099, 1106 (9th Cir. 2000). To withstand a motion for summary judgment, the non-movant

1  must then show that there are genuine factual issues which can only be resolved by the trier of fact.
2  Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000). The non-moving party
3  may not rely on the pleadings alone, but must present specific facts creating a genuine issue of
4  material fact through affidavits, depositions, or answers to interrogatories. Fed. R. Civ. P. 56(e);
5  Celotex, 477 U.S. at 324.
6      The court must review the record as a whole and draw all reasonable inferences in favor of
7  the non-moving party. Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003).
8  However, unsupported conjecture or conclusory statements are insufficient to defeat summary
9  judgment. Id.; Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008). Moreover, the
10  court is not required "'to scour the record in search of a genuine issue of triable fact,'" Keenan v.
11  Allan, 91 F.3d 1275, 1279 (9th Cir.1996) (citations omitted), but rather "may limit its review to the
12  documents submitted for purposes of summary judgment and those parts of the record specifically
13  referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir.
14  2001).

15  **II.  Analysis**

16      **A.  Objections to Evidence**

17      Urban has filed 26 objections to the evidence submitted by DCI in opposition to Urban's
18  motion. The Court does not need to address the bulk of Urban's objections because they relate to
19  evidence or characterizations of evidence upon which the Court has not relied. The Court
20  therefore **OVERRULES AS MOOT** objections 2, 3, 4, 6, 10, 11, 12, 13, 14, 15, 18, 22, 23, 24,
21  25, and 26. The Court rules on the remainder of Urban's objections as follows:

22          1.  Declaration of Steven C. Finley ¶¶ 10, 15, and 28
23              (Objection Nos. 1, 5, 7, 8, 9, 16, 17, and 21)

24      A declaration used to support or oppose a motion must be made on personal knowledge, set
25  out facts that would be admissible in evidence, and show that the declarant is competent to testify
26  on the matters stated. Fed. R. Civ. P. 56(c)(1)(4).[1] In preparing his declaration, Steven Finley
27  reviewed and relied on Urban's pricing agreements, tariffs, and invoices from its freight carriers.

---

28      [1] The Federal Rules of Civil Procedure were amended effective December 1, 2010. Prior to the effective date of change, the rule was contained in Fed. R. Civ. P. 56(e)(1).

Finley has adequately articulated the basis for his declaration, relied on personal knowledge, and relied on admissible evidence. The pricing agreements and related documents upon which Finley relied are business records and, in any event, qualify as admissible under the residual exception to the hearsay rule. Accordingly, the Court **OVERRULES** Urban's objections as they relate to Steven Finley's summary of Urban's pricing agreements, tariffs, and invoices from its freight carriers.

2. Relevance of Rate Reductions with Gilbert
(Objection Nos. 19 and 20)

It is undisputed that DCI's recommendations identified potential savings with Gilbert, and Urban has not argued in its motion or reply that Gilbert is not an LTL carrier. Instead, in a "supplemental statement of facts" filed a week after its motion for summary judgment, Urban asserted that Gilbert is a "pool carrier," not an LTL carrier. Based on its assertion that Gilbert is a "pool carrier," Urban objects to relevance of evidence regarding rate reductions Urban obtained from Gilbert. In doing so, Urban relies on the deposition testimony of Robert Fike. Although Fike acknowledged that Gilbert is a "pool carrier," he also stated that a "pool carrier" and an LTL carrier are the same thing. See Urban's Supp. Lodgment, Ex. 8. The Court therefore **OVERRULES** Urban's objection to evidence regarding rate reductions with Gilbert.

**B.     Fraud in the Inducement**

Urban argues there is no factual basis for DCI's fraud in the inducement claim. Urban points out that the contract was negotiated entirely by two individuals, John Kyees on behalf of Urban and Kirk Conole on behalf of DCI. Based on portions of Conole's deposition, Urban argues there is no evidence indicating that Kyees made any affirmative misrepresentations. DCI does not contend that Kyees, or any other Urban employee, made any affirmative misrepresentations. Instead, DCI argues that Urban fraudulently concealed the fact that it never intended to honor its contractual obligations in the first place. DCI points to instances in which Urban was uncooperative in providing requested information, denied the existence of a contract, and otherwise hindered DCI's performance under the agreement.

Fraud in the inducement, or promissory fraud, is a subspecies of fraud and deceit. Engalla v. Permanente Medical Group, Inc., 15 Cal. 4th 951, 974 (1997). "A promise to do something

necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud . . . An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." Id. (citation omitted). The elements of fraud are a "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." Engalla v. Permanente Medical Group, Inc., 15 Cal. 4th 951, 974 (1997). Something more than nonperformance is required to prove a defendant's intent not to perform his promise. Tenzer v. Superscope, Inc., 39 Cal. 3d 18, 30 (1985) (citations omitted). However, fraudulent intent must often be established by circumstantial evidence, and "fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform." Id. (citation omitted).

      Here, DCI has not attempted to refute Urban's argument that John Kyees exercised good faith in negotiating and entering into the contract on Urban's behalf. Instead, DCI argues that the Urban employees to whom Kyees delegated responsibility (Kenneth McKinney, Matt Kaness, and Terese Tubbs) denied the existence of the contract and failed to provide DCI with requested information. However, DCI has not submitted any evidence connecting McKinney, Kaness, and Tubbs to the contract negotiations or its formation. Indeed, nothing in the record indicates those individuals even knew about DCI at the time the parties entered into the contract. Accordingly, to the extent McKinney and Kaness "acted as if they were unaware" of the contract, see Compl. ¶ 4, there is no basis for ascribing a fraudulent motive to such behavior. That McKinney, Kaness, and Tubbs may have become displeased with the contract and failed to cooperate with DCI's representatives does not necessarily bear on whether Urban fraudulently concealed an intent not to perform at the time it entered into the contract. To defeat summary judgment, DCI must introduce evidence beyond Urban's failure to perform or cooperate under the agreement. See Tenzer, 39 Cal. 3d at 30. Based on the foregoing, the Court concludes the record is insufficient to create a triable fact as to whether, at the time it entered into the contract, Urban fraudulently concealed an intent

not to perform its obligations thereunder.  Accordingly, the Court **GRANTS** Urban's motion for summary judgment as it relates to DCI's fraud in the inducement claim.

### C. Breach of Contract

#### 1. Opportunity to Cure

Urban maintains that DCI failed to provide Urban with an opportunity to remedy its alleged breach, and that such failure is a bar to this action.  DCI responds, and the Court agrees, that the opportunity to remedy any breach is a condition on termination of the contract, and it does not preclude a party from seeking legal recourse in the event of a breach.[2]  In any event, DCI provided written notice of the alleged breach in a July 2008 letter from Jim Baker to John Kyees.

#### 2. Relationship between "Savings" and Fees

The parties dispute the relationship between the "Savings" and "Fees and Timing" provisions of the contract.  DCI points out that, because of the nature of services it provides, there is always a possibility that a client can claim its savings resulted from factors besides DCI's recommendations.  DCI argues that the mechanism for calculating "Savings" accounts for that possibility, and that DCI is entitled to "Fees" regardless of whether Urban used its recommendations.  Urban maintains that DCI is entitled to "Fees" only if Urban used its recommendations.

DCI's focus on the calculation of "Savings" is misplaced.  The contract expressly defines "Savings" as limited to those savings that "result from any DCI recommendation."  Moreover, under the heading "Fees and Timing," the contract provides that "DCI shall not be compensated for any recommendation which [Urban] declines and does not use."  Accordingly, the Court rejects DCI's argument that it is entitled to compensation regardless of whether Urban used its recommendations.

#### 3. Whether Urban Used DCI's Recommendations

Although Urban repeatedly emphasizes that "DCI shall not be compensated for any recommendation which [Urban] declines and does not use," the inverse is also true.  DCI *is* entitled

---

[2] The contract provides: "In the event any breach is alleged, Client or DCI shall have, upon written notice from the other, 30 days to remedy said breach. If breach is not remedied within 30 days, the engagement shall be considered terminated."

to compensation for recommendations which Urban *does* use. This action centers on the question of whether Urban secretly used DCI's recommendations. DCI has submitted evidence to indicate that Urban had not negotiated for, or obtained, discounts with any of its carriers prior to receipt of DCI's recommendations. DCI has also submitted evidence to indicate that Urban obtained rate reductions from its carriers after DCI disclosed its recommendations.

For example, in December 2006, Urban entered into a two-year price agreement with New Penn that increased Urban's base rate by 3% in the first year and by 2% in the second year. See Pl.'s Lodgment, Ex. 17.2. Urban's Terese Tubbs did not ask for a rate reduction in connection with the December 2006 pricing agreement. See Pl.'s Lodgment, Ex. 5.3. Nor had Tubbs ever asked for a rate reduction prior to the December 2006 pricing agreement, according to Tubbs and New Penn's account manager, William Sawdey. See Pl.'s Lodgment, Exs. 3.6 and 5.4. In its November 2007 Disclosure of Savings, DCI estimated that Urban would be able to save at least 20% on its rates with New Penn. A few months after DCI and Urban ceased all communications, in December 2008, Urban negotiated a 27% rate reduction with New Penn. Finley Decl. ¶ 10.

Urban obtained rate reductions from the other carriers as well. In its November 2007 Disclosure of Savings, DCI estimated that Urban would be able to save at least 3% on its rates with Gilbert. In December 2008, Urban approached Gilbert and obtained a 3% rate reduction. Finley Decl. ¶ 28. DCI estimated that Urban would be able to save at least 30% on its rates with Roadway. In July 2008, Terese Tubbs called Roadway's attention to the above market rates, and Roadway's account manager confirmed that if approached by DCI, Roadway "will not do the lower rates." See Pl.'s Lodgment, Exs. 15.1-2. Yet in April 2009, Urban obtained a 17.5% rate reduction from Roadway. Finley Decl. ¶ 15.

Based on the foregoing, there is a material dispute as to whether Urban used DCI's recommendations in order to negotiate better rates with carriers and obtain "Savings." Accordingly, the Court **DENIES** Urban's motion for summary judgment as it relates to DCI's breach of contract claim.

///

**D.     Breach of the Implied Covenant of Good Faith and Fair Dealing**

Urban argues that it satisfied all express provisions of the contract, and therefore it cannot be liable for breach of the implied covenant of good faith and fair dealing. In doing so, Urban points out that DCI managed to issue its Disclosure of Savings in November 2007. DCI responds that Urban failed to cooperate in providing pricing agreements and other information, that Urban managers denied the existence of the contract, and that Terese Tubbs contacted Roadway's account manager to ensure Roadway would not agree to DCI's proposed rates.

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." Kransco v. American Empire Surplus Lines Ins. Co., 23 Cal.4th 390, 400 (Cal. 2000) (quotation omitted). The covenant does not impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement. Guz v. Bechtel National, Inc., 24 Cal.4th 317, 349-50 (Cal. 2000). It exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement. Id. at 349. A breach of the implied covenant shows that the defendant's conduct, "whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." Careau & Co. v. Security Pacific Business Credit, Inc., 222 Cal. App.3d 1371, 1395 (Cal. Ct. App. 1990).

Urban is wrong to suggest that because DCI was able to provide some recommendations, Urban performed all of its contractual obligations. The contract expressly required Urban "to cooperate in good faith with DCI and readily furnish any data requested by DCI to complete implementation or confirm existence/amount of Savings."[3] Pl.'s Lodgment, Ex. 6.1. DCI has

---

[3] DCI cites John Kyees' failure to sign a letter of authorization as evidence of bad faith. However, the contract provided that either DCI or Urban could implement DCI's recommendations. See Pl.'s Lodgment, Ex. 6.1. In addition the contract provided that Urban could "decline and not use" DCI's recommendations. Id.

submitted evidence that Urban employees, most notably Terese Tubbs, refused to cooperate in good faith and thereby frustrated the purpose of the agreement. Tubbs acknowledged at her deposition that it would reflect poorly on her if DCI were able to obtain lower rates from carriers. See Pl.'s Lodgment, Ex. 3.9. In July 2008, Tubbs contacted Roadway's account manager to ensure that Roadway would not accede to DCI's "push for lower rates." See Pl.'s Lodgment, Ex. 15.1.

Although Terese Tubbs was the only person at Urban that could provide the amount of Urban's "spend," (i.e. the amount spent on shipping), no one from Urban asked Tubbs to collect the data regarding Urban's spend. DCI's independent contractor, Robert Fike, did contact Tubbs directly, but Tubbs did not cooperate in sending copies of Urban's pricing agreements to DCI. See Conole Decl. ¶ 6; Baker Decl. ¶ 10; Pl.'s Lodgment, Exs. 2.7-2.8, 10.1-10.3. She eventually sent some, but not all, of the requested agreements after DCI's representatives called John Kyees to complain. See Conole Decl. ¶ 6; Baker Decl. ¶ 10; Pl.'s Lodgment, Exs. 2.7-2.8, 10.1-10.3.

Finally, at a certain point, John Kyees temporarily delegated oversight of the project to Urban's Strategic Planning Manager, Matt Kaness. See Baker Decl. ¶ 9; Pl.'s Lodgment, Ex. 14.1. Kaness refused to cooperate with DCI and even denied that there was a signed contract between the parties. See Baker Decl. ¶ 9; Pl.'s Lodgment, Ex. 14.1.

Based on the evidence in the record, and drawing all reasonable inferences in favor of DCI, the Court concludes there is a material dispute as to whether Urban deliberately frustrated the purpose of the agreement. Accordingly, The Court **DENIES** Urban's motion for summary judgment as it relates to DCI's claim for breach of the implied covenant of good faith and fair dealing.

**E.     Quantum Meruit**

Urban argues that because the parties had an express written agreement covering compensation, DCI cannot pursue a quantum meruit claim. DCI responds that quantum meruit is an available remedy when the contractually agreed upon amount of compensation is not a "liquidated debt." To the extent damages cannot be calculated with reasonable certainty, DCI argues it is entitled to pursue a quantum meruit claim.

In advancing its argument that the existence of a written contract covering compensation

precludes a quantum meruit recovery, Urban relies on Hedging Concepts, Inc. v. First Alliance Mortgage Co., 41 Cal. App. 4th 1410 (1996), Wal-Noon Corp. v. Hill, 45 Cal. App. 3d 605 (1975), and Wagner v. Glendale Adventist Medical Center, 216 Cal. App. 3d 1379 (1989). However, none of those cases stands for the proposition that a contract term covering compensation invariably bars a quantum meruit recovery.

In Hedging Concepts, the trial court awarded plaintiff a quantum meruit recovery although plaintiff had failed to perform an express condition precedent to the right to be paid under the contract. 41 Cal. App. 4th at 1419. On appeal, the California Court of Appeal reversed the award, concluding that the trial court's award, along with its finding that plaintiff had not performed the condition precedent, conflicted with the express terms of the contract. Like Hedging Concepts, Wal-Noon and Wagner are cases in which courts have refused to imply contract terms "at variance" with the express contract. 45 Cal. App. 3d at 613; 216 Cal. App. 3d at 1393. That is not what DCI asks the Court to do here. DCI merely asks the Court to preserve its right to seek restitution in the event contract damages cannot be calculated with reasonable certainty.[4]

Under California law, a party who has been injured by a breach of contract may generally decide which remedy it will seek. Chodos v. West Publishing Co., 292 F.3d 992, 1001 (9th Cir. 2002). "He may treat the contract as rescinded and may recover upon a quantum meruit so far as he has performed; or he may keep the contract alive, for the benefit of both parties, being at all times ready and able to perform; or, third, he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing." Id. (quoting Alder v. Drudis, 182 P.2d 195 (Cal. 1947). If a plaintiff has fully performed a contract, damages for breach are often the only available remedy. Chodos, 292 F.3d at 1001. However, "full performance does not make restitution unavailable if any part of the consideration due from the defendant in return is something other than a liquidated debt." Id. (citing Oliver v. Campbell, 43 Cal.2d 298, 306 (1954) (emphasis deleted).

In Chodos, a writer entered into a contract with a publisher. 292 F.3d at 995. In exchange

---

[4] The California courts use the terms "quantum meruit" and "restitution" interchangeably. Chodos v. West Publishing Co., 292 F.3d 992, 1001 n.8 (9th Cir. 2002) (citing In Re Estate of Ford, 96 Cal. App.4th 386 (Cal. Ct. App. 2002).

1  for writing a legal treatise, the writer was entitled to receive 15% of the gross revenues from sales
2  of the treatise. Id. When the publisher failed to publish the book, the writer sought a recovery in
3  quantum meruit. Id. at 996. The district court granted summary judgment to the publisher, and the
4  Ninth Circuit reversed. Id. at 1000-03. According to the court, "whether [the writer] can recover
5  on a quantum meruit claim turns on whether the 15% of the gross revenues provided for in the
6  agreement constitutes a 'liquidated debt.'" Id. at 1000-03. The Court held that "[t]he mere
7  existence of a fixed percentage royalty in a contract does not render that royalty a 'liquidated debt,'
8  if the revenues to which that percentage figure is to be applied cannot be calculated with
9  reasonable certainty." Id. at 1002. Notably, although the Ninth Circuit assumed for purposes of its
10 analysis that the writer had completed performance, it cast doubt on its own assumption, observing
11 that the publisher's rejection of the manuscript prior to completion of the editing process had
12 prevented the writer from completing performance. Id. at 1002 n.9.

13       This case resembles Chodos in important respects. It is unclear whether DCI completed its
14 performance under the contract. There is material dispute as to whether Urban failed to cooperate
15 and thereby prevented DCI from completing its obligations under the contract. In addition, the
16 contract provides for a fixed percentage contingency fee. Compare Pl.'s Lodgment, Ex. 6.1
17 ("Client's fee to DCI shall be an amount equal to thirty-three (33%) of the cumulative Savings."),
18 with Chodos, 292 F.3d at 995 ("The Author Agreement provided for no payments to Chodos prior
19 to publication, and a 15% share of the gross revenues from sales of the work."). Although Urban
20 did not render its own performance impossible, as did the publisher in Chodos, the question of
21 whether and to what extent Urban secretly implemented DCI's recommendations and obtained
22 "Savings" is materially disputed. As a result, even if the Court were to conclude that DCI fully
23 performed under the contract, the Court is unable to conclude at this stage that this case involves a
24 "liquidated debt." Accordingly, the Court **DENIES** Urban's motion for summary judgment as it
25 relates to DCI's quantum meruit claim.
26 ///
27 ///
28 ///

## CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Urban's motion for summary judgment or, in the alternative, partial summary judgment. The Court **GRANTS** the motion as it relates to DCI's fraud in the inducement claim and **DENIES** the motion as it relates to each of DCI's remaining claims.

**IT IS SO ORDERED.**

**DATED: April 5, 2011**

*Irma E. Gonzalez*
**IRMA E. GONZALEZ, Chief Judge
United States District Court**